# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

BAY AREA UNITARIAN UNIVERSALIST CHURCH; DRINK HOUSTON BETTER, L.L.C.,
doing business as ANTIDOTE COFFEE; PERK YOU LATER, L.L.C.,
*Plaintiffs-Appellants*,

v.

HARRIS COUNTY DISTRICT ATTORNEY KIM OGG; COUNTY SHERIFF ED GONZALEZ;
WEBSTER ACTING CHIEF PETE BACON; CHIEF OF HOUSTON POLICE DEPARTMENT
TROY FINNER,
*Defendants-Appellees.*

On Appeal from the United States District Court
For the Southern District of Texas (Werlein, J.)

## PLAINTIFFS-APPELLANTS' EN BANC BRIEF

Alla Lefkowitz
Andrew Nellis
Everytown Law
P.O. Box 14780
Washington, D.C. 20044
(202) 545-3257
alefkowitz@everytown.org
anellis@everytown.org

Laura Keeley
Everytown Law
450 Lexington Ave.
P.O. Box 4184
New York, NY 10017
(646) 324-8198
lkeeley@everytown.org

Charlotte H. Taylor
    *Counsel of Record*
Jones Day
51 Louisiana Ave., N.W.
Washington, D.C. 20001
(202) 879-3872
ctaylor@jonesday.com

William R. Taylor
Jones Day
717 Texas Street, Suite 3300
Houston, TX 77002
(832) 239-3860
wrtaylor@jonesday.com

*Counsel for Plaintiffs-Appellants*

## CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Fifth Circuit Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

1. Plaintiffs-Appellants **Bay Area Unitarian Universalist Church; Drink Houston Better, L.L.C., d/b/a/ Antidote Coffee; Perk You Later, L.L.C.**

2. Defendants-Appellees **Harris County District Attorney Kim Ogg; Harris County Sheriff Ed Gonzalez; Chief of Webster Police Department Pete Bacon; Chief of Houston Police Department Troy Finner (now J. Noe Diaz).**

The following law firms and counsel have participated in the case, either in the district court or on appeal:

| Plaintiff-Appellant | Counsel |
|---|---|
| Bay Area Unitarian Universalist Church; Drink Houston Better, L.L.C., d/b/a Antidote Coffee; Perk You Later, L.L.C. | Charlotte H. Taylor Lesley Roe JONES DAY 51 Louisiana Avenue, N.W. Washington, D.C. 20001 |
| | William R. Taylor JONES DAY 717 Texas Street, Suite 3300 Houston, TX 77002 |
| | Alla Lefkowitz Andrew Nellis EVERYTOWN LAW P.O. Box 14780 Washington, D.C. 20044 |
| | Laura Keeley EVERYTOWN LAW 450 Lexington Avenue P.O. Box 4184 New York, NY 10017 |

| Defendants-Appellees | Counsel |
|---|---|
| Harris County District Attorney Kim Ogg Harris County Sheriff Ed Gonzalez | Heena Kepadia Moustapha Gassama Matthew P. Miller HARRIS COUNTY ATTORNEY'S OFFICE 1019 Congress Plaza, 15th Floor Houston, TX 77002 |
| Chief of Webster Police Department Pete Bacon | William S. Helfand Justin C. Pfeiffer Norman Ray Giles LEWIS BRISBOIS BISGAARD & SMITH 24 Greenway Plaza, Suite 1400 Houston, TX 77046 |

Sean Braun
WILSON ELSER MOSKOWITZ EDELMAN
& DICKER
909 Fannin Street
Suite 3300, Suite 1400
Houston, TX 77098

Chief of Houston Police
Department Troy Finner
(now J. Noe Diaz)

Donald B. Hightower
Melissa Azadeh
Tiffany Sue Bingham
Charles H. Houston, III
CITY OF HOUSTON LEGAL
DEPARTMENT
900 Bagby Street, 4th Floor
Houston, TX 77002

Respectfully Submitted,

*/s/ Charlotte H. Taylor*

Charlotte H. Taylor
*Counsel of Record for Appellants*

## STATEMENT REGARDING ORAL ARGUMENT

The Court has tentatively calendared this case for oral argument during the week of January 19, 2026.

# TABLE OF CONTENTS

**Page**

INTRODUCTION ............................................................................1

JURISDICTIONAL STATEMENT .................................................4

STATEMENT OF THE ISSUES.......................................................4

STATEMENT OF THE CASE...........................................................5

    A.    Legal and Factual Background.........................................5

    B.    Procedural History..........................................................13

SUMMARY OF THE ARGUMENT ................................................16

ARGUMENT ..................................................................................17

I.    Plaintiffs Have Adequately Alleged Injury in Fact. ..................18

    A.    The challenged statutes subject Plaintiffs to asymmetric, discriminatory treatment. ...................................................19

    B.    The challenged statutes subject Plaintiffs to an unconstitutional condition...........................................................................22

        1.    Posting the prescribed signage injures Plaintiffs. ...................22

            (a)    Expressive injury .......................................22

            (b)    Pocketbook injury.......................................24

            (c)    Reputational injury .....................................25

        2.    Refusing to post the prescribed signage would also injure Plaintiffs. ..................................................................26

            (a)    Injury to property rights.............................27

            (b)    Injury to associational freedom ..................34

        3.    It Is Settled Law That an Allegedly Unconstitutional Choice Inflicts an Injury. ........................................35

II.    Plaintiffs Also Satisfy Article III's Traceability and Redressability Requirements. ......................................................................36

    A.    Plaintiffs' injuries are fairly traceable to Defendants. ......................37

    B.    Plaintiffs' injuries are redressable by a favorable judicial ruling. .....39

III.    Standing in This Case Should Not Be Complicated.....................41

CONCLUSION ...............................................................................43

# TABLE OF CONTENTS
(continued)

**Page**

CERTIFICATE OF SERVICE ..................................................................45

CERTIFICATE OF COMPLIANCE .......................................................46

# TABLE OF AUTHORITIES

**Page**

CASES

*Air Evac EMS, Inc. v. Texas, Dep't of Ins., Div. of Workers' Comp.,*
851 F.3d 507 (5th Cir. 2017) ............................................................37

*Califano v. Westcott,*
443 U.S. 76 (1979)...........................................................................41

*Cedar Point Nursery v. Hassid,*
594 U.S. 139 (2021).........................................................................30

*City of Clinton v. Pilgrim's Pride Corp.,*
632 F.3d 148 (5th Cir. 2010) ..........................................................18

*City of Erie v. Pap's A.M.,*
529 U.S. 277 (2000).........................................................................24

*Czyzewski v. Jevic Holding Corp.,*
580 U.S. 451 (2017).........................................................................24

*Davis v. FEC,*
554 U.S. 724 (2008)....................................................................19, 20

*Dep't of Com. v. New York,*
588 U.S. 752 (2019).........................................................................31

*Dep't of Tex., Veterans of Foreign Wars v. Tex. Lottery Comm'n,*
760 F.3d 427 (5th Cir. 2014) (en banc) ..........................................41

*Diamond Alt. Energy, LLC v. EPA,*
145 S. Ct. 2121 (2025)..............................................................passim

*Dolan v. City of Tigard,*
512 U.S. 374 (1994).........................................................................27

vii

*Edionwe v. Bailey*,
    860 F.3d 287 (5th Cir. 2017) ........................................................18

*FDA v. All. for Hippocratic Medicine*,
    602 U.S. 367 (2024)........................................................................39

*General Land Office v. Biden*,
    71 F.4th 264 (5th Cir. 2023) ....................................................31, 32

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*,
    515 U.S. 557 (1995)........................................................................21

*K.P. v. LeBlanc*,
    627 F.3d 115 (5th Cir. 2010) .........................................................37

*Larson v. Valente*,
    456 U.S. 228 (1982)........................................................................38

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992)............................................................18, 37, 42

*Marbury v. Madison*,
    5 U.S. (1 Cranch.) 137 (1803) .......................................................41

*McCullen v. Coakley*,
    573 U.S. 464 (2014)........................................................................21

*McDonald v. Longley*,
    4 F.4th 229 (5th Cir. 2021) ............................................................35

*Meese v. Keene*,
    481 U.S. 465 (1987)........................................................................26

*Members of City Council of City of Los Angeles v. Taxpayers for Vincent*,
    466 U.S. 789 (1984)........................................................................43

*Perry v. Sindermann*,
    408 U.S. 593 (1972)........................................................................35

*Peter Henderson Oil Co. v. City of Port Arthur*,
806 F.2d 1273 (5th Cir. 1987) ......................................................... 35

*Quinones v. City of Evanston*,
58 F.3d 275 (7th Cir. 1995) .............................................................. 37

*Reed v. Town of Gilbert*,
576 U.S. 155 (2015) .................................................................... 20, 23

*Reno v. ACLU*,
521 U.S. 844 (1997) .................................................................... 31, 33

*Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*,
487 U.S. 781 (1988) .................................................................... 22, 23

*Roberts v. U.S. Jaycees*,
468 U.S. 609 (1984) ......................................................................... 35

*Sessions v. Morales-Santana*,
582 U.S. 47 (2017) ........................................................................... 41

*Texas Corn Producers v. EPA*,
141 F.4th 687 (5th Cir. 2025) ..........................................3, 24, 32, 42

*Texas v. Equal Emp. Opportunity Comm'n*,
933 F.3d 433 (5th Cir. 2019) ........................................................... 35

*Thole v. U. S. Bank N.A.*,
590 U.S. 538 (2020) ........................................................................... 1

*Time Warner Cable, Inc. v. Hudson*,
667 F.3d 630 (5th Cir. 2012) ........................................................... 19

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021) .................................................................... 25, 26

*United States ex rel. Branch Consultants v. Allstate Ins. Co.*,
560 F.3d 371 (5th Cir. 2009) ........................................................... 18

*United States v. Texas,*
    599 U.S. 670 (2023)......................................................................24

*Uzuegbunam v. Preczewski,*
    592 U.S. 279 (2021)......................................................................40

*W. Va. State Bd. of Educ. v. Barnette,*
    319 U.S. 624 (1943)......................................................................24

*Young Conservatives of Tex. Found. v. Smatresk,*
    73 F.4th 304 (5th Cir. 2023) ........................................................24

STATUTES

28 U.S.C. § 1291.................................................................................4

28 U.S.C. § 1331.................................................................................4

28 U.S.C. § 1343.................................................................................4

28 U.S.C. § 2201.................................................................................4

28 U.S.C. § 2202.................................................................................4

Texas Penal Code § 30.05...........................................................passim

Texas Penal Code § 30.06...........................................................passim

Texas Penal Code § 30.07...........................................................passim

RULES

Fed. R. App. P. 4.................................................................................4

Fed. R. App. P. 12......................................................................13, 18

OTHER AUTHORITIES

1 William Blackstone, *Commentaries on the Laws of England* 140 (3d
    ed. 1884) .................................................................................2, 27

**INTRODUCTION**

Texas has enacted a criminal trespass scheme that—both on its face and according to its authors—is designed to make it more expensive and more burdensome for property owners to exclude firearms from their private property. Plaintiffs are a church and a coffee shop that wish to do exactly that, so they complied with the expensive and burdensome signage requirements of Texas trespass law. They also brought this First Amendment challenge to the statutory scheme, because they object to the number, size, verbiage, and format of the state-mandated signs and would prefer to express their intent to exclude in a less obtrusive manner. The merits of Plaintiffs' First Amendment arguments are not before this Court. The only question presented is whether Plaintiffs have established their standing to sue. As a panel of this Court already rightly concluded, they have.

The en banc Court should not "make standing law more complicated than it needs to be." *Thole v. U. S. Bank N.A.*, 590 U.S. 538, 547 (2020). "To demonstrate standing, plaintiffs must answer a basic question—'What's it to you?'" *Diamond Alt. Energy, LLC v. EPA*, 145 S. Ct. 2121 (2025) (citation omitted). Plaintiffs have a ready answer to that question: they have posted compliant signage bearing a state-scripted message in order to exercise their right to exclude, as the law says they must. They would prefer to choose their own means of expression, as the First Amendment guarantees they have a right to do. If they win this lawsuit, they will be able speak

1

in their own words while also exercising their "sacred and inviolable right" to exclude unwanted visitors from their property, 1 William Blackstone, *Commentaries on the Laws of England* 140 (3d ed. 1884). They therefore "possess a personal stake in the dispute and are not mere bystanders." *Id.* (citation and alterations omitted).

The district court dismissed Plaintiffs' claims on the theory that the challenged statutes do not even *injure* Plaintiffs. That is puzzling, given that both Plaintiffs have posted signs to which they object in order not to forgo their core property right to exclude. So Plaintiffs—at a minimum—are suffering an ongoing First Amendment injury. The district court, however, reasoned that Plaintiffs' injury was self-inflicted because they were only speculating that the statutes actually affect anyone's real-world conduct. That is, according to the district court, Plaintiffs could post noncompliant signs, which carry no legal effect, and firearm owners might all obey them anyway. On appeal, a panel of this Court reversed. But the dissent agreed with the district court's premise: whether Plaintiffs post compliant signage or not simply makes no difference.

The dissent's and the district court's reasoning is at odds with Plaintiffs' allegations, the record, and common sense. The criminal law has a deterrent effect on potential trespassers, including responsible Texas gun owners who may wish to carry their firearms wherever the law permits—but not where the law forbids. Were it otherwise, the Texas landscape surely would not be dotted with section 30.06 and

30.07 signs. But it is. This type of commonsense inference about third-party behavior is entirely appropriate in the standing context where injuries predictably flow from government rules, as both the Supreme Court and this Court have recently reaffirmed. *Diamond Alt.*, 145 S. Ct. 2121; *Texas Corn Producers v. EPA*, 141 F.4th 687 (5th Cir. 2025).

But even if common sense were not so decisively on Plaintiffs' side, the record amply establishes that property owners without legally effective no-firearm signs will attract more firearm-carrying trespassers than property owners whose signs put trespassers at risk of arrest or prosecution. There are public internet fora where firearm owners trade information about which businesses use compliant signage; there are "Second Amendment auditors" who actively test the full extent of their right to carry firearms; and employees of the plaintiff coffee shop have been drawn into confrontations with putative patrons who wish to carry firearms onto its premises but recognize that the shop's compliant signage means they cannot. ROA.41; ROA.1231-33; ROA1248-64; ROA 2216-18; ROA.2219-94.

In short, property owners across Texas know that the law matters, and property owners' desire to be protected by the law compels them to post signs that they otherwise would not. For Plaintiffs, who would prefer to speak their message in a different, less burdensome and less costly format, this compulsion is an injury.

The district court should be reversed, and Plaintiffs should be allowed to argue the merits of their case.

## JURISDICTIONAL STATEMENT

Drink Houston Better LLC d/b/a Antidote Coffee, Perk You Later, LLC (collectively, "Antidote") and Bay Area Unitarian Universalist Church (the "Church") sued the Harris County District Attorney, Harris County Sheriff, City of Webster Chief of Police, and City of Houston Chief of Police, all in their official capacities. The Church and Antidote sought a declaratory judgment that the heightened notice requirements imposed by Texas Penal Code §§ 30.06 and 30.07 are unconstitutional and an injunction against their enforcement pursuant to 28 U.S.C. §§ 2201 and 2202. The district court had subject-matter jurisdiction over these federal claims pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3).

The district court's final opinion and order dismissing Plaintiffs' action for lack of subject-matter jurisdiction was entered on March 16, 2023. Plaintiffs filed a notice of appeal on April 14, 2023. *See* Fed. R. App. P. 4(a)(1)(B). This Court has jurisdiction pursuant to 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

I.   Texas's trespass scheme imposes burdensome signage requirements for prohibiting firearms that force Plaintiffs to choose between their right to exclude entrants and their right to free expression. The complaint pleads, and

4

record evidence substantiates, that Plaintiffs have posted government-scripted signs despite preferring to post less obtrusive "no guns" signs, that Plaintiffs have spent money on these signs, that the Church has sacrificed its right to exclude concealed firearms from its premises, and that Defendants enforce the laws as written. Did the district court err in holding that Plaintiffs lack standing to sue Defendants and that amending the complaint would be futile?

## STATEMENT OF THE CASE

### A. Legal and Factual Background

Texas's trespass law generally provides that "a person commits an offense if the person enters or remains on or in [the] property of another … without effective consent and the person … had notice that the entry was forbidden." Tex. Penal Code § 30.05(a). "Notice" is broadly defined to include, among other things, "oral or written communication by the owner or someone with apparent authority" and "a sign or signs posted on the property or at the entrance to the building, *reasonably likely to come to the attention of intruders.*" § 30.05(b)(2) (emphasis added). This statutory scheme applies to the property owner's exclusion of virtually anyone or anything, except firearms; a licensed handgun owner has a defense under section 30.05 if her only would-be violation is that "entry with a handgun was forbidden." § 30.05(f).

Thus, if a property owner seeks to exclude handguns, more onerous requirements come into play. Under Penal Code sections 30.06 and 30.07, a "license holder" commits trespass only if the property owner "provides notice to the person by oral or written communication." §§ 30.06(b), 30.07(b). And notice under these statutes is substantially more burdensome than under section 30.05. For the purpose of excluding license holders carrying *concealed* handguns, "Written communication" is defined as:

> (A) a card or other document on which is written language identical to the following: "Pursuant to Section 30.06, Penal Code (trespass by license holder with a concealed handgun), a person licensed under Subchapter H, Chapter 411, Government Code (handgun licensing law), may not enter this property with a concealed handgun"; or
> (B) a sign posted on the property that … includes the language described by Paragraph (A) in both English and Spanish … with block letters at least one inch in height.

§ 30.06(c)(3). Meanwhile, to exclude license holders carrying handguns *openly*, "Written communication" is defined (slightly) differently:

> (A) a card or other document on which is written language identical to the following: "Pursuant to Section 30.07, Penal Code (trespass by license holder with an openly carried handgun), a person licensed under Subchapter H, Chapter 411, Government Code (handgun licensing law), may not enter this property with a handgun that is carried openly"; or

(B) a sign posted [at each entrance to] the property that … includes the language described by Paragraph (A) in both English and Spanish … with block letters at least one inch in height.

§ 30.07(b)(3).

Consequently, a property owner who wishes to post signage excluding all firearms from her property must obtain and display at least three signs—a sign under section 30.06 relating to licensed, concealed handguns, a sign under section 30.07 relating to licensed, openly carried handguns, and another sign pertaining to all other firearms, including rifles. *See* § 30.05(c).  And if the property has multiple entrances, even more 30.07 signs are required.  *See* § 30.07(c)(3)(B)(iii).  If that sounds burdensome, that's because it is meant to be.  This statutory regime was designed to be "intentionally … cumbersome" in order to "discourage" property owners from excluding firearms from their property.  ROA.28 & n.1; ROA.1014.

*Impact on Plaintiffs.*  The record in this case underscores that burden.  Both Antidote and the Church wish to exclude members of the public from carrying firearms onto their property.  ROA.44-46 ¶¶ 64, 71; ROA.1209 ¶ 3; ROA.1226 ¶ 7.

The Church wants to exclude weapons for both expressive and associational reasons.  ROA.1209-11.  Yet despite its official policy of excluding both concealed and openly carried firearms, the Church displays only section 30.07 signs, because the full panoply of signs required to exclude all firearms would take up too much space on its entryways and would be too obtrusive.  ROA.44-45 ¶ 61, 64; ROA.1209

7

¶¶ 3-4.  That means it is forgoing its right to exclude concealed, licensed firearms under section 30.06.  But the Church believes that the presence of weapons in the Church runs counter to fundamental religious tenets like exercising compassion and love for others.  ROA.1211, 1215.

By contrast, Antidote has attempted to strictly comply with the signage regime, which has required it to purchase, display, and replace multiple signs on multiple occasions, expending around five hundred dollars in the process—much more than a simple no-guns sign would cost.  ROA.46-47 ¶¶ 71-72, 74; ROA.1225-27 ¶¶ 4, 11-12.  Even the Church's limited display has cost it over one hundred dollars.  ROA.44 ¶ 60; ROA.1209 ¶ 4.

Nor are the Plaintiffs' burdens limited to dollars and cents.  The Church believes that the signs detract from its religious message of welcome and inclusivity, reduce visibility out of the church doors which may undermine security, and impair the experience of its congregants.  ROA.44-45 ¶¶ 61-63, 65, 67; ROA.1209-11 ¶¶ 4, 6, 8, 10.  And Antidote similarly believes that the signs are detrimental to its intended family-friendly aesthetic and drown out other messages that Antidote wishes to communicate.  ROA.46 ¶ 73; ROA.1226-27 ¶¶ 6, 8, 10.  The signs have also caused Antidote to receive negative online reviews.  *See, e.g.*, ROA.1777 (one-star rating from Google user who explained the low rating by stating: "The coffee shop posts 30.06 and 30.07 signage.").

As both the pleadings and the record in this case establish, the signs also attract unwanted attention. Some customers are bothered by them, while other customers seek to defy and intentionally flout them. ROA.41, 47 ¶¶ 48-49, 77-78, 80; ROA.1228 ¶ 13; ROA.1234-38; ROA.1254-63, 1269-70. For example, on one occasion while the owner of Antidote was replacing the section 30.06 and 30.07 signs outside Antidote, a man confronted her regarding the signage, forcing her into an unwanted conversation regarding the precise statutory requirements. ROA.1269-70. On another occasion, a man who brought a handgun to Antidote and was asked to leave later returned to the shop carrying a sword. ROA.1254-63.

To be sure, the statutory scheme allows property owners wishing to exclude firearms to use alternative means of providing notice: individualized oral or written notice to each entrant. *See* §§ 30.06(b), 30.07(b). But individualized notice—personally informing everyone who enters the Church or Antidote about the no-firearms policy—is impractical and burdensome for obvious reasons: among other things, it would require dedicating employees' time to providing notice to all entrants, and it would require those employees to engage in uncomfortable and potentially dangerous confrontations with armed individuals. ROA.40, 43, 47 ¶¶ 42, 54, 79; ROA.1212 ¶ 14; ROA.1228 ¶ 14. And beyond the impracticality, both the Church and Antidote believe that providing individualized notice would distort and detract from the experience they wish to offer their congregants and customers,

respectively. ROA.1212 ¶¶ 15-16; ROA.1228 ¶¶ 15-17. In other words, the alternative means of notice are equally or more burdensome—and property owners seeking to exclude for *any other reason* can use the signage of their choosing rather than engaging in individual encounters with each entrant.

***Defendants' Actions.*** Plaintiffs are located in the cities of Houston and Webster, in Texas; they brought this lawsuit against the government officials charged with enforcement of the challenged statutory scheme. ROA.31, 43, 45 ¶¶ 8, 10-12, 56, 70. The record evidence in this case shows that officers and prosecutors employed by Defendants are specifically trained on the nuances of the signage requirements under sections 30.05, 30.06, and 30.07. ROA.1302-12, 1317, 1355-58, 1366-68, 1401-23, 1101-04. In particular, officers and prosecutors are trained that property owners must post separate signs compliant with each of the three statutes— sections 30.05(c), 30.06, and 30.07—to provide notice that all guns are prohibited. ROA.1317 (Texas Commission on Law Enforcement training material stating that "[i]mportantly, … the owners must have the applicable (*i.e.*, separate) signage for each type of carriage they wish to prohibit."); ROA.1412-23 (Harris County Prosecutor's Office training materials delineating three separate types of required signage).

Plaintiffs also submitted evidence showing that officers employed by Defendants put this training into practice. For example, on one occasion, the

Webster Police Department responded to a call for service at a "Cheddar's" restaurant, involving a person carrying a concealed weapon. ROA.1425-26, 1166-68. Chief Bacon testified that "[a]t some point, the weapon was observed, apparently by management, resulting in a phone call [to] the police department." ROA.1166. The resulting event report states that Cheddars "DOES HAVE 30.07 POSTED," indicating that officers reviewed the posted signage for open carry and determined it compliant when evaluating how to respond at the scene. ROA.1425. Chief Bacon testified "based on [the Event Report], I do not believe … that Cheddars has a 30.06 sign posted." ROA.1167. And "[i]n the absence of a 30.06 sign, I do not believe that the officers would have the right to remove the gentleman from the premises, unless Cheddars, again, insisted." ROA.1167-68. Chief Bacon further testified that the incident "was cleared without an arrest," and the event report indicates that the patron was not removed from Cheddars. ROA.1166.

**_Predictable Consequences of Law on Third Parties._** The record establishes that members of the public are acutely attuned to the impact of sections 30.06 and 30.07 signage on the consequences they may face for entering private property with a gun. There are multiple websites—including texas3006.com—where individuals post about non-compliant signs. ROA.41 ¶ 49. If a business's sign does not "precisely comply with the requirements" of sections 30.06 and 30.07, "some users see [it] as an opportunity to bring guns into those places anyway because they face

11

no criminal consequences for doing so." *Id*. As one individual posted, "I walked right past a sign yesterday that said 'No firearms allowed'. I thought it was cute." *Id.* n.7.

And as Houston's police officer training materials show, law enforcement is aware that members of the public, such as so-called "Second Amendment Auditors," actively test the limits of Texas trespass law by carrying guns "into private business[es] … in an attempt to engage the public or law enforcement."



ROA.2217. There is thus nothing speculative about Plaintiffs' belief that they must post conforming signage to give effective notice of their intent to exclude licensed handguns.

## B.     Procedural History

Plaintiffs allege that enforcement of the heightened notice requirements of sections 30.06 and 30.07 violates their freedom of speech under the federal and state constitutions as well as the Church's First Amendment freedom of association. ROA.52-55 ¶¶ 99-123.   After discovery was complete, the district court granted judgment on the pleadings to Defendant Troy Finner, Chief of the Houston Police Department, under rule 12(c).  ROA.870-82.[1]  In the district court's view, Plaintiffs lacked standing because the challenged statutes do not *require* Plaintiffs to post any signs, and Plaintiffs' allegations—that failing to post the prescribed signage would mean forgoing the protection of the trespass laws—were "based on conjectural and hypothetical imaginings of what the police might do or might not do and what the prosecutors might do and might not do under various scenarios."  ROA.879-81.

The remaining Defendants then similarly sought dismissal of Plaintiffs' claims.  The district court granted judgment on the pleadings to Defendants Kim Ogg, District Attorney for Harris County, and Ed Gonzalez, County Sheriff for Harris County, under rule 12(c), and dismissed Plaintiffs' claims against Defendant Bacon for lack of subject-matter jurisdiction, under rule 12(b)(1).  ROA.2126-48. As before, the district court concluded that Plaintiffs were not injured because the statutes did not *require* them to post anything and because the governmental benefit

---

[1] Troy Finner has since been replaced by Chief J. Noe Diaz.

afforded to those who post the prescribed signage "is entirely dependent on hypothetical and conjectural future actions of third parties and events that may or may not occur." ROA.2136-41. The court further determined that the Plaintiffs' claimed injuries were not traceable to Defendants Ogg, Gonzalez, or Bacon because "[t]hey are not the promulgators of § 30.06 and § 30.07" and because they do not "enforce … those legislative enactments against Plaintiffs." ROA.2143. Finally, the district court concluded that Plaintiffs' injuries were also not redressable because the court "has no authority to strike parts of a criminal statute." ROA.2144-45. The district court also denied Plaintiffs' motion for leave to amend their complaint and to incorporate information adduced in discovery. ROA.2147 & n.18.

Plaintiffs appealed, and a panel of this Court reversed. First, the panel held that "Plaintiffs suffer an ongoing injury because they are subject to a statutory scheme that treats varying types of similar speech differently. Specifically, property owners who wish to express a prohibition on firearms are treated differently from property owners who wish to express a prohibition on virtually any other item or entrant." Op. 7 (citations omitted). The panel observed that it is irrelevant that Plaintiffs "are not *required* to post compliant signage" because the signage regime presents Plaintiffs with "a dilemma, the horns of which entail different harms." Op. 8. Namely, "[i]f Plaintiffs do post compliant signs, they suffer an 'asymmetrical treatment' injury. If Plaintiffs do not post compliant signs, their right to exclude is

limited because property rights are protected by the deterrent value of the criminal laws." Op. 8. And the panel rejected the notion that Plaintiffs' harms were speculative, observing that the record shows that "police sit on their hands in the absence of compliant signage or oral notice to a trespasser coupled with a subsequent refusal to leave," and noting that "it is predictable that handgun owners will be affected by Defendants' strict enforcement of the allegedly unconstitutional signage requirements." Op. 9 n.4.

The panel also readily concluded that Plaintiffs' injuries were traceable to Defendants and redressable in court. The panel noted that, "[w]hen an injury flows from an allegedly unconstitutional law, the individuals charged with the enforcement of that law are at least part of the cause of the injuries, satisfying the minimal traceability requirement." Op. 10. And the panel observed that an injunction against the enforcement of "the heightened notice requirements imposed by §§ 30.06(c)(3) and 30.07(c)(3) … would remove the asymmetrical treatment at the hands of the government." Op. 10-11.

Judge Jones dissented from the panel's injury analysis. Dissent 1. The dissent disagreed that the statutes imposed asymmetrical treatment because "plaintiffs' signs and other statutorily prescribed signs cover entirely different subjects." *Id.* The dissent also observed that "even if the Plaintiffs refuse to post the statutory wording on their signs, the police will still come when they call." *Id.* at 2. Consequently, in

the dissent's view, "whether Plaintiffs post the prescribed sign, a modified sign, or no sign at all, makes no difference to their right to protection as landowners or occupants of the property." *Id.* at 3. Next, the dissent disagreed with Plaintiffs' claimed expressive injury because (1) Plaintiffs do not "disagree with the 'message' on the posters" and (2) "there is no penalty attached to Plaintiffs' refusals to post the statutory language." *Id.* at 3-4. Finally, the dissent disputed that Plaintiffs' claims of reputational harm were legally cognizable. *Id.* at 5. This Court vacated the panel decision and set the case for rehearing en banc.

## SUMMARY OF THE ARGUMENT

Plaintiffs are concretely injured by the heightened notice requirements set forth at sections 30.06(c)(3) and 30.07(c)(3).

Sections 30.06 and 30.07 unevenly burden Plaintiffs' right to exclude guns compared with property owners seeking to exclude for other reasons. To begin with, purchasing and posting signage compliant with sections 30.06 and 30.07 is more expensive than posting simple "no guns" signage, and the challenged statutory scheme thus works an economic injury. Plaintiffs are also obligated to express their intent to exclude firearms using a burdensome, government-scripted message—a requirement that does not apply to property owners seeking to exclude for other reasons.

Plaintiffs are further injured by being put to an unconstitutional choice: either forgo the right to speak in the manner of their choosing or forgo the deterrent effect of the criminal trespass law to protect their most fundamental property rights. As a result of this coercive choice, Plaintiffs have engaged in compelled speech to which they object. The injury analysis can end there. But the Church has also sacrificed its right to exclude openly carried handguns and, as a result, its associational freedom to congregate for religious services without handguns present.

In addition, Plaintiffs' injuries are directly traceable to Defendants—local police chiefs and prosecutors—who enforce the trespass law as written and train their staffs accordingly. Their adherence to the letter of the statutes means that the deterrent effect of the criminal law fully protects Plaintiffs' property rights only if they post conforming signs. For the same reason, Plaintiffs' injuries are redressable by an injunction preventing enforcement of sections 30.06(c)(3) and 30.07(c)(3).

The district court's orders dismissing Plaintiffs' claims for lack of jurisdiction and denying leave to amend the complaint on futility grounds were erroneous. The panel decision reversing the district court's orders was correct. This Court should reverse the district court's judgment and remand.

## ARGUMENT

The Church and Antidote are concretely injured by enforcement of the heightened notice requirements of sections 30.06 and 30.07, and the injury is both

traceable to Defendants and redressable by a court order declaring the heightened notice requirements unconstitutional. The district court erred in concluding that the Church and Antidote failed to establish standing and that amending the complaint would be futile. This Court's review is de novo. *Edionwe v. Bailey*, 860 F.3d 287, 291 (5th Cir. 2017) (Rule 12(c) judgment on the pleadings is reviewed de novo); *United States ex rel. Branch Consultants v. Allstate Ins. Co.*, 560 F.3d 371, 376 (5th Cir. 2009) (Rule 12(b)(1) dismissal for lack of subject matter jurisdiction is reviewed de novo); *City of Clinton v. Pilgrim's Pride Corp.*, 632 F.3d 148, 152 (5th Cir. 2010) (denial of leave to amend on futility grounds is reviewed de novo).

## I. Plaintiffs Have Adequately Alleged Injury in Fact.

"[A]n injury in fact [is] an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (cleaned up). The challenged statutes concretely injure Plaintiffs in at least two ongoing ways. *First*, as the panel recognized, the statutes impose asymmetrical treatment on Plaintiffs' speech. Plaintiffs, who wish to communicate that guns are not welcome on their premises, are treated less favorably than similarly situated property owners who wish to communicate, for example, that pets are not welcome on their premises. *Second*, as the panel also recognized, the statutes place Plaintiffs on the horns of a dilemma. If Plaintiffs accede to the statutes' prescriptions, they sacrifice their

expressive rights, must expend additional costs, and suffer reputational harm. But if Plaintiffs ignore the statutes, then a core element of their property rights—their right to exclude—is unmistakably diminished; and for the Church, this means also sacrificing its associational freedom. This unconstitutional condition injures Plaintiffs.

### A. The challenged statutes subject Plaintiffs to asymmetric, discriminatory treatment.

"Discriminatory treatment at the hands of the government is an injury long recognized as judicially cognizable. And such injury is recognizable for standing irrespective of whether the plaintiff will sustain an actual or more palpable injury as a result of the unequal treatment under law or regulation." *Time Warner Cable, Inc. v. Hudson*, 667 F.3d 630, 636 (5th Cir. 2012) (citation omitted). Here, sections 30.06 and 30.07 of the Texas Penal Code single out for discriminatory treatment property owners who wish to keep firearms off their property. Such property owners, including Plaintiffs, must comply with burdensome signage requirements that are inapplicable to all other property owners, such as those who wish to keep dogs or shirtless customers off their property. *See* §§ 30.06, 30.07. The discriminatory treatment inherent in the statutes is patent.

The panel recognized this, relying principally on *Davis v. FEC*, 554 U.S. 724 (2008). *See* Op. 7-8. In *Davis*, the Supreme Court held that a political candidate had standing to challenge a statute that imposed an "asymmetrical regulatory

scheme," under which "self-financing candidates" and "non-self-financing candidates" were subject to different fundraising caps. 554 U.S. at 729. In that case, the government argued that the plaintiff, a self-financing candidate, was not actually injured because, in the end, his opponent did not take advantage of the "asymmetrical limits." *Id.* at 734. The Court rejected that argument, holding that being subjected to the "asymmetrical contribution scheme" was injury enough for Article III. *Id.* at 734-35.

The panel dissent accepts *Davis* but rejects its applicability here, saying that because there is no "content symmetry," the "[d]issimilar signs are apples and oranges." Dissent 1. But that gets it backwards: the fact that trespass signs excluding different subjects are treated differently is *precisely the problem.* Because the statutory scheme "imposes more stringent restrictions on [no guns] signs than it does on signs conveying other messages," its "provisions are content-based regulations of speech" that burden First Amendment interests. *Reed v. Town of Gilbert*, 576 U.S. 155, 159 (2015). In other words, the content-based distinction drawn by the challenged statutes cuts to the heart of the First Amendment's protections. Under Texas's signage regime, a sign that says "no guns allowed" has no legal effect, but an otherwise identical sign that says "no pets allowed" is legally enforceable against trespassers. *See generally* §§ 30.05, 30.06, 30.07. Because Plaintiffs' speech is burdened by this differential treatment, they are injured.

The dissent further purported to distinguish *Davis* by observing that, "[i]n *Davis*, the 'asymmetry' affected direct adversaries." Dissent 2. But the First Amendment's protection against message-based discrimination has never been limited to a directly adversarial or electoral context. Rather, its "purpose [is] to preserve an uninhibited marketplace of ideas in which truth will ultimately prevail." *McCullen v. Coakley*, 573 U.S. 464, 476 (2014); *see also Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 573-74 (1995) ("[The] general rule, that the speaker has the right to tailor the speech, [is] enjoyed by … ordinary people engaged in unsophisticated expression…." (citations omitted)). And Plaintiffs showed that they *are* relatively disadvantaged in the marketplace of ideas, because the burdensome signage requirements—taking up over ten square feet of space, ROA.1225 ¶ 5—drown out other messages they wish to convey, ROA.46 ¶ 73 (required signage has displaced other messages on Antidote's storefront); ROA.1210-11 ¶¶ 6-7 (signs restrict space for the Church's other messaging). They also disadvantage Plaintiffs in the exchange of ideas by forcing them to make a "bold political statement" that provokes confrontations when they would prefer a more nuanced message, ROA.1226 ¶ 6, *see also* ROA.1269-70 (confrontation over signage requirements); ROA.1259-61 (individual with gun departed premises but later returned with a sword). Again, property owners wishing to exclude for any other reason would not suffer these consequences; they are free to use their facades

21

to communicate whatever they wish to say in the manner in which they want to say it.

To be clear, whether Defendants can proffer a sufficient justification for the asymmetric treatment of Plaintiffs' no-guns signs is a merits question that is not now before the Court. *See* Op. 11-12 ("express[ing] no opinion on" merits of Plaintiffs' claims). But the dissent's suggestion that Plaintiffs are not even subjected to asymmetric, content-discriminatory treatment in the first place is plainly incorrect.

## B. The challenged statutes subject Plaintiffs to an unconstitutional condition.

Plaintiffs are also injured because whether or not they post the prescribed signage, "[e]ither choice here results in harm." Op. 8. Posting the signage requires them to expend their financial resources, to speak in a manner they disagree with, and to expose themselves to reputational injury. But posting noncompliant signage is no better: doing so would invite trespassers, who the record shows would face no consequences for carrying licensed handguns onto Plaintiffs' properties, even in knowing derogation of Plaintiffs' express wishes.

### 1. Posting the prescribed signage injures Plaintiffs.

Plaintiffs suffer multiple distinct, concrete injuries from posting the signs.

### (a) Expressive injury

"The First Amendment mandates that we presume that speakers, not the government, know best both what they want to say and how to say it." *Riley v. Nat'l*

*Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 790-91 (1988). Accordingly, "the government, even with the purest of motives, may not substitute its judgment as to how best to speak for that of speakers and listeners." *Id.* at 791. As Plaintiffs alleged, and the record confirms, Plaintiffs wish to express the message that guns are not permitted on their premises in a different, less obtrusive fashion from what the challenged statutes prescribe. ROA.40-41, 45-48 ¶¶ 44-48, 67, 69, 73, 82; ROA.1210-11 ¶¶ 6-11; ROA.1226-27 ¶¶ 6-10. By preventing Plaintiffs from expressing themselves in their preferred manner and instead dictating the exact words that Plaintiffs must speak and the exact format in which they must speak them, the challenged statutes work a First Amendment injury.

The dissent is thus incorrect when it asserts that Plaintiffs are not injured because they "aren't saying they disagree with the 'message' on the posters." Dissent 3. There is no "disagreement" requirement for First Amendment injury. For example, in *Reed*, the plaintiffs were not required to express a *message* they disagreed with; rather, on the basis of the content of their message, the challenged law was restricting the *manner* of their speech, and the Court held it violated their free speech rights. *See* 576 U.S. at 159-61. Indeed, the intrusion on the manner of speech can be very slight and still cause a First Amendment injury; for example the Supreme Court has held that the desire to dance nude, rather than in a g-string, is

expressive interest triggering First Amendment scrutiny. *City of Erie v. Pap's A.M.*, 529 U.S. 277, 289 (2000).

The dissent was therefore incorrect when it stated, "Plaintiffs cannot suffer a First Amendment 'injury' by posting their own views at their places of worship/business." Dissent 4. If that were the rule, the First Amendment would have nothing to say about a law that requires individuals to proclaim their religion, their political affiliation, or their sexual orientation in public. The First Amendment, thankfully, forbids any such compulsion. *See W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 634 (1943) (explaining that First Amendment right not to salute flag does not "turn on one's possession of particular religious views or the sincerity with which they are held").

### (b)    Pocketbook injury

Setting aside Plaintiffs' First Amendment injury, posting the prescribed signage also imposes tangible pocketbook injuries on Plaintiffs. "Monetary costs are of course an injury." *United States v. Texas*, 599 U.S. 670, 676 (2023). And "[t]he injury 'need not measure more than an identifiable trifle' because 'the injury in fact requirement under Article III is qualitative, not quantitative, in nature.'" *Tex. Corn Producers*, 141 F.4th at 697 (quoting *Young Conservatives of Tex. Found. v. Smatresk*, 73 F.4th 304, 309 (5th Cir. 2023)); *see also, e.g., Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451, 464 (2017) ("For standing purposes, a loss of even a

small amount of money is ordinarily an 'injury.'").  As Plaintiffs alleged, and the record supports, the burdensome signage regime requires Plaintiffs to post more, larger signs than they otherwise would, thus causing Plaintiffs to expend more of their financial resources.  ROA.41-47 ¶¶ 50, 60, 69, 71, 74; ROA.1209-11 ¶¶ 4, 11; ROA.1225-27 ¶¶ 4, 8, 12.  The dissent did not address this pocketbook injury.

### (c)    Reputational injury

Reputational harms, though "intangible," can also satisfy Article III's requirements.  *TransUnion LLC v. Ramirez*, 594 U.S. 413, 425 (2021).  Plaintiffs alleged that the prescribed signs serve as a "Scarlet Letter" and that they attract the opprobrium of members of the public.  ROA. 41, 47 ¶¶ 48-49, 78.  And the record demonstrates that people have indeed taken notice of Antidote's 30.06 and 30.07 signs and have expressed their dissatisfaction and intention to take their business elsewhere.  ROA.1777; ROA.1780.

The dissent discounts Plaintiffs' allegations of reputational harm on the theory that, "to constitute an injury in fact, reputational harm must 'bear[] a "close relationship" to … the reputational harm associated with the tort of defamation.'"  Dissent 5 (alteration in original) (quoting *TransUnion*, 594 U.S. at 432).  With respect, that overstates the Supreme Court's holding in *TransUnion*.  There, to be sure, the Court stated that "injuries with a close relationship to harms traditionally recognized as providing a basis for lawsuits in American courts" suffice for

Article III purposes. 594 U.S. at 425. And the Court recognized that the reputational harm caused by defamation is one such cognizable harm. *Id.* But the Court cautioned that "we do not require an exact duplicate." *Id.* at 433. And in fact, for the proposition that "reputational harms" inflict cognizable injury, the Court cited *Meese v. Keene*, 481 U.S. 465, 473 (1987)—which did not involve defamation, and which is closely similar to this case. *See* 594 U.S. at 425.

In *Meese*, the plaintiff complained that federal law had designated as "political propaganda" certain films he wished to screen. 481 U.S. at 467-68, 473. Although the challenged statutory scheme did not directly regulate the plaintiff, and the plaintiff was in no sense defamed, the Court nevertheless agreed that the designation of the films as propaganda would harm the plaintiff's reputation if he went through with his desired exhibition of the films—and as such, he had standing to challenge the law. *See id.* at 473-76. The same is true of Plaintiffs here, who—the record establishes—have suffered and will suffer reputational harm for seeking to exclude handguns under sections 30.06 and 30.07. They too are injured.

### 2. Refusing to post the prescribed signage would also injure Plaintiffs.

Plaintiffs cannot avoid injury by simply not posting the signs. Rather, the challenged statutes have put them to a choice between, on the one hand, suffering the expressive, monetary, and reputational injuries just described while preserving

their property and associational rights or, on the other, forgoing their property and associational rights in order to avoid those injuries.

### (a)    Injury to property rights

A private property owner's exclusive control over her property is a "sacred and inviolable right."  1 William Blackstone, *Commentaries on the Laws of England* 140 (3d ed. 1884).  Indeed, "the right to exclude others" is "one of the most essential sticks in the bundle of rights that are commonly characterized as property."  *Dolan v. City of Tigard*, 512 U.S. 374, 384 (1994) (citation omitted).  If Plaintiffs decline to post signage that comports exactly with the statutes' onerous requirements, this essential property right will be impaired, and Plaintiffs will be damaged.

On a plain reading of sections 30.05(f), 30.06, and 30.07, if Plaintiffs post prominent "no guns" signs that do not comport with the heightened requirements of section 30.06(c)(3) and 30.07(c)(3), license holders who enter Plaintiffs' premises with handguns would violate no law.  Because they violate no law, they risk neither arrest nor prosecution for that act. Indeed, the Defendants' officers and prosecutors are specifically trained on the nuances of the law, and record evidence bears out the unsurprising fact that the police strictly enforce the law as written.  *See* ROA.1317; ROA.1366-68;    ROA.1404-05;    ROA.1410;    ROA.1412-23;    ROA.1101-04; ROA.2216; ROA.1425-26; ROA.1166-68.

The dissent suggests that Plaintiffs are not harmed because Defendants' officers consistently respond to calls. *See* Dissent 2-3. The dissent cites the testimony of Church administrator Sharlene Rochen that the Webster Police Department has always responded promptly when she calls (though none of the calls involved uninvited entrants with firearms). *Id.* But that the police come when summoned is both unsurprising and irrelevant to Plaintiffs' claims. As the panel opinion correctly observes, what matters is not *whether* the police come but what they do once they arrive. *See* Op. 9 n.4. The record evidence shows that a license holder with a gun will not be ejected by police unless the property owner posts the precise signage that the statutes require. *See* ROA.1425-26; ROA.1166-68; *see also* Op. 9 n.4 (observing that "the record … shows that police sit on their hands in the absence of compliant signage or oral notice to a trespasser coupled with a subsequent refusal to leave").[2] To be perfectly clear, this is no criticism of Defendants' officers, who are simply following the law, as they should. But because Defendants enforce the law as written, Plaintiffs are harmed.

In his petition for rehearing en banc, Chief Bacon asserted that "the Church's choice not to display a sign under §30.06 has no effect on the Webster Police

---

[2] Plaintiffs' proposed amended complaint would have incorporated this evidence into Plaintiffs' allegations that Defendants enforce the statutes as written. *See* ROA.924-29 ¶¶ 35-49.

Department's response" and that the department "responds to calls and investigates all trespass reports in the same manner irrespective of whether the complaining property owner posts signs under §§30.06 or 30.07."  Bacon Pet. 3.  But Plaintiffs have proffered evidence to the contrary.  *See* ROA.1425-26; ROA.1166-68.  At best, this is a factual dispute, which cannot be resolved in Defendants' favor at this stage of the case.  Opening Br. 23-25.

That said, it is doubtful that Chief Bacon means to say that his officers will defy Texas law.  Rather, his position seems to be that the absence of prescribed signage does not *really* matter because if "the officer dispatched to the site … notif[ies] the suspect he or she must leave the property," then the trespasser will "face arrest" *if* he or she subsequently fails to leave.  Bacon Pet. 3.  Along similar lines, Chief Diaz argues that "nothing prevents [Plaintiffs'] employees from calling law enforcement … and asking the responding officers to deliver the oral notice specified by the Penal Code."  Diaz Pet. 9.

Defendants' statements are true so far as they go, but they are wrong to suggest that this negates Plaintiffs' harm. To be sure, if a license holder is orally informed that his handgun is unwelcome, he will be in violation of the trespass laws if he then continues to remain on the premises. *See* §§ 30.06(a)-(b), (g), 30.07(a)-(b), (h).  But that does not cure the problem.  To state the obvious, if Plaintiffs post a simple "no guns" sign, license holders may ignore the sign and enter with a

handgun—knowing they are in full compliance with the criminal trespass code—and they may remain on the premises while Plaintiffs summon the police and while they wait for the police to arrive. That is in itself an invasion of Plaintiffs' property rights. *Cf. Cedar Point Nursery v. Hassid,* 594 U.S. 139, 150 (2021) (holding that regulation requiring property owner to grant others access to its property is a taking in light of "the central importance to property ownership of the right to exclude").[3]

Even though Plaintiffs' legal rights are clearly diminished by this statutory scheme, the dissent's position seems to be that Plaintiffs are still not *injured* for Article III purposes because, as a practical matter, Plaintiffs would have to call the police anyway. *See* Dissent 3 ("Plaintiff may call the police—which they'd have to do for official protection—and the police would arrive to eject the person. No posters need to be published to accomplish the person's ouster"). Thus, the

---

[3] Nor does it negate the harm that Plaintiffs could themselves give individualized oral notice that firearms are prohibited on their property. As Plaintiffs alleged, personally asking armed trespassers to leave creates risks of physical confrontation. ROA.40 ¶ 42. The Church trains its greeters to ask entrants with firearms to leave them outside, if the greeter is comfortable doing so; otherwise, if they are uncomfortable, or if the entrant becomes confrontational, the greeters are trained to call the police. ROA.45 ¶ 68; ROA.1212 ¶ 13. Antidote's staff prefer to call the police because they are not comfortable asking entrants with firearms to leave. ROA.47 ¶¶ 79, 81; ROA.1228 ¶ 15. Indeed, on multiple occasions, armed trespassers at Antidote have argued with or intimidated staff when asked to depart. ROA.47 ¶ 80; ROA.1250-64. And again, property owners giving notice of their intent to exclude for other reasons are not forced to choose between burdensome, government-scripted signage and burdensome, uncomfortable one-on-one confrontations.

30

argument goes, because the police would be called to remove the armed trespassers in any event, it makes no difference to Plaintiffs whether they post the prescribed signage or not.

That is wrong. Common sense confirms what courts have recognized—that "deterrence flows from criminal sanctions." Op. 8-9; *see Reno v. ACLU*, 521 U.S. 844, 872 (1997). Here, that means when a business posts signs compliant with sections 30.06 and 30.07, persons carrying guns will predictably not enter because they are on notice that entry with a gun is prohibited, backed by criminal trespass law. By contrast, when a business posts non-compliant signs, at least some persons carrying guns will choose to enter, since doing so is not a crime. And the Supreme Court has held repeatedly that standing may be premised on "the predictable effect of Government action on the decisions of third parties." *Dep't of Com. v. New York*, 588 U.S. 752, 768 (2019); *see also Diamond Alt.* 145 S. Ct. at 2136 ("When third party behavior is predictable, commonsense inferences may be drawn.").

This Court has recently reaffirmed this principle as well. In *General Land Office v. Biden*, 71 F.4th 264 (5th Cir. 2023), for example, this Court held that Texas had standing to challenge the federal government's reduction in spending for the border wall. *See id.* at 268. As this Court explained, "increased miles of border wall will make the border harder to cross," and therefore "in the absence of longer walls, at least some illegal aliens who otherwise would have been prevented from entering

Texas will seek driver's licenses, education, and healthcare from Texas." *Id.* at 273. This Court rejected the argument that Texas lacked standing because its "alleged injuries are attributable to third parties—the illegal immigrants." *Id.* at 273. In short, Texas had standing because less border wall would *predictably* mean more migration, which *predictably* meant more people drawing on Texas's resources. So it is here—no criminal sanctions for license holders *predictably* means more armed trespassers on Plaintiffs' property; and it matters not that the trespassing individuals are "third parties." *See also Tex. Corn Producers*, 141 F.4th at 698 (5th Cir. 2025) (finding standing where "*[e]conomic logic and common sense* create a substantial risk that" third-parties will manufacture vehicles that consume less of plaintiffs' liquid fuel (emphasis added)).

In any event, the Court need not rely on common sense alone. The record in this case confirms that Texas gun owners know and follow the law. *See* ROA.1780 (texas3006.com "Wall of Shame" post listing Antidote and commenting "I guess I have to go somewhere else for coffee."). If a business posts a simple "no guns" sign, persons carrying guns *do* enter with knowledge that the notice is legally insufficient and thus their entry with a firearm does not constitute trespass. *See* ROA.1233 ("I walked right past a sign yesterday that said 'No firearms allowed'. I thought it was cute."). Indeed, Plaintiffs alleged, and the record supports, that so-called Second Amendment Auditors in Texas pay scrupulous attention to the requirements of

sections 30.06 and 30.07 and carry their handguns where the law says they may, irrespective of the property owner's express wishes. ROA.41 ¶ 49 & n.7; ROA.1231-33; ROA.2216-18 ¶¶ 42-44; ROA.2291-94. The heightened notice requirements of sections 30.06 and 30.07 thus deprive Plaintiffs of the deterrent value of the criminal law, unless Plaintiffs conform to the onerous signage requirements. *See Reno v. ACLU*, 521 U.S. 844, 872 (1997) (recognizing that deterrence flows from "criminal sanctions."). The district court was wrong to conclude that "[t]he 'benefit' of deterrence is entirely dependent on hypothetical and conjectural future actions of third parties and events that may or may not occur." ROA.2141.

The dissent ultimately does not seem to contest that Plaintiffs "are deprived of the 'deterrent value' of the criminal law" but argues that it makes no difference because "the Plaintiffs can still order anyone off their property and call the police to enforce the law." Dissent 4. But again, the lack of deterrence means that Plaintiffs will have to endure an increased number of trespassers. That the trespassers will eventually leave once police arrive does not undo Plaintiffs' injury. Contrast their situation with that of a property owner who posts a simple "no pets" sign. Anyone who ignores the sign and enters with a dog is immediately in violation of the trespass law and is subject to potential arrest and prosecution. That will deter at least some law-abiding pet owners from entering in the first place.

In the end, the dissent's position—that "whether Plaintiffs post the prescribed sign, a modified sign, or no sign at all, makes no difference to their right to protection as landowners or occupants of the property," Dissent 3—blinks reality. If it were actually true that obtaining and posting compliant 30.06 and 30.07 signage made *no difference*, few if any property owners would go to the burden and expense of doing so. In reality, Texas3006.com (which is cited in Plaintiffs' complaint, ROA.41 n.8) has documented *over thirty-four thousand* businesses in Texas with 30.06 or 30.07 signs posted. *See* https://texas3006.com/view.php; *see also* https://texas3006.com/map.php. These tens of thousands of Texans are not posting onerous signs for no reason. They recognize that failing to post compliant signage effectively invites unwanted firearms onto one's property.

### (b)    Injury to associational freedom

For the same reasons, the signage requirements have coerced the Church into forgoing its full right of religious association. As noted above, the Church does not post 30.06 signs because doing so would be too burdensome and would obscure too much of the Church's front doors, which it would prefer to use to convey messages of non-violence and inclusivity. ROA.44 ¶ 61; ROA.1209 ¶ 4. That means it is forgoing its right to exclude licensed, concealed firearms. But the Church believes that the presence of weapons in the Church runs counter to fundamental religious tenets like exercising compassion and love for others. ROA.1211, 1215.

Consequently, the Church's freedom of association is also being harmed, in addition to its property rights. *See McDonald v. Longley*, 4 F.4th 229, 245 (5th Cir. 2021) ("For groups that engage in expressive association, the '[f]reedom of association … plainly presupposes a freedom not to associate.'" (alteration in original) (*quoting Roberts v. U.S. Jaycees*, 468 U.S. 609, 623 (1984))).

### 3.      It Is Settled Law That an Allegedly Unconstitutional Choice Inflicts an Injury.

The foregoing discussion demonstrates that the challenged statutes put all property owners who, like the Plaintiffs, wish to exclude guns to a dilemma: If they fully exercise and secure their property rights, they must post the prescribed signage, which is a burden on their speech rights as well as a financial and reputational burden. On the other hand, if they fully exercise their speech rights by refusing to post the prescribed signage, the state impairs a key element of their property rights, their right to exclude unwanted visitors.

Assuming, as the Court must for standing purposes, that Plaintiffs are "correct on the merits of [their] claim[s]," *Texas v. Equal Emp. Opportunity Comm'n*, 933 F.3d 433, 447 (5th Cir. 2019), that is unconstitutional. *See, e.g.*, *Perry v. Sindermann*, 408 U.S. 593, 597 (1972) ("[The government] may not deny a benefit to a person on a basis that infringes his constitutionally protected interests—especially, his interest in freedom of speech."). And importantly, at this stage of the case, being put to that choice is *itself* an injury. *See Peter Henderson Oil Co. v. City of Port Arthur*, 806

F.2d 1273, 1275 (5th Cir. 1987) (holding that plaintiff was injured "immediately" when its "use of … property" was conditioned "upon an *allegedly* unconstitutional requirement" (emphasis added)).

The dissent rejected Plaintiffs' unconstitutional-conditions argument on the basis that "Plaintiffs have given up no right, they are not forced to post any sign or any compliant sign, and they are deprived of no benefit." Dissent 5. Similarly, the dissent asserted that Plaintiffs are not subjected to compelled speech because "there is no penalty attached to Plaintiffs' refusals to post the statutory language." *Id.* at 4. For the reasons explained above, these conclusions are at odds with the operation of the statutory scheme. *See supra* Section B.2.a.

It does not matter which of the horns of this dilemma plaintiffs have chosen. It is enough that they have to choose one of two coercive options. *See* Op. 10 ("[W]hichever path Plaintiffs choose—to post the compliant signage or to not— harm lies ahead, which means their injuries are not 'self-inflicted.'"). Plaintiffs have made their choices and, as a result, have been injured multiple times over.

## II. Plaintiffs Also Satisfy Article III's Traceability and Redressability Requirements.

Although the panel dissent focused only on Article III's injury requirement, Plaintiffs have also established traceability and redressability.

### A. Plaintiffs' injuries are fairly traceable to Defendants.

Article III requires "a 'fairly traceable' causal connection 'between the injury and the conduct complained of.'" *Air Evac EMS, Inc. v. Texas, Dep't of Ins., Div. of Workers' Comp.*, 851 F.3d 507, 514 (5th Cir. 2017) (quoting *Lujan*, 504 U.S. at 560). Defendants need not be the sole or proximate cause of Plaintiffs' injury but merely "among those who would contribute to Plaintiffs' harm." *Id.* (quoting *K.P. v. LeBlanc*, 627 F.3d 115, 123 (5th Cir. 2010)). As the panel explained, "[w]hen an injury flows from an allegedly unconstitutional law, the individuals charged with the enforcement of that law are at least part of the cause of the injuries, satisfying the minimal traceability requirement." Op. 10 (citing *K.P.*, 627 F.3d at 123). As should now be clear, Defendants' enforcement of the challenged statutes is indeed among the causes of Plaintiffs' harm. *See supra* Section B.2.a. Plaintiffs' injury is therefore fairly traceable to Defendants.

The district court held that Plaintiffs' injuries were not traceable to Defendants because they "are not the promulgators of § 30.06 and § 30.07." ROA.2143. But as Judge Easterbrook once explained in a similar context, that "reflects a serious misunderstanding. A person aggrieved by the application of a legal rule does not sue the rule *maker*"—he does not sue, for example, "a state's legislature." *Quinones v. City of Evanston*, 58 F.3d 275, 277 (7th Cir. 1995). The district court also rejected traceability on the ground that Defendants do not "enforce or threaten enforcement

of [the challenged statutes] *against Plaintiffs*." ROA.2143 (emphasis added). That too misstates what Article III requires. Standing to challenge a law is not limited to "directly regulated parties" but extends to all who are "likely" injured thereby. *Diamond Alt.*, 145 S. Ct. at 2135-36.

Indeed, the dissent does not directly contest the panel's traceability analysis. *Cf.* Dissent 1 (expressing only disagreement with panel's injury holding). Two statements, however, merit a response. First, in its discussion of the deterrent value of the criminal law, the dissent asserts that "any would-be trespassers['] … audacity is not attributable to the Texas statute." Dissent 4. But Plaintiffs' injuries flow from the challenged statutes' immunization of license holders from criminal trespass liability (unless Plaintiffs post the prescribed signage). It is predictable that, if Plaintiffs do not post the prescribed signs, some license holders will enter Plaintiffs' property with guns against Plaintiffs' wishes, because the law permits them to do so. That harm is attributable to the statutes (as enforced by Defendants).[4]

---

[4] To be sure, *some* license holders might trespass on Plaintiffs' property no matter what the statutory language. Harm inflicted by *those* audacious trespassers would indeed not be attributable to the challenged statutes, *cf.* Dissent 4. But this Court should not assume that all Texas gun owners will flout trespass law. And the existence of *some* such trespassers would not negate Plaintiffs' standing, as long as some Texas gun owners follow the law. *Cf. Larson v. Valente*, 456 U.S. 228, 243 n.15 (1982) (for Article III standing, a plaintiff does not need to demonstrate that a favorable decision will "relieve [their] every injury").

Second, the dissent asserts that Antidote's reputational harm, which was evidenced in part by a negative online review, ROA.1777, is "traceable only to the third party posts on Google, not to the Defendants." Dissent 5. *See also* ROA.1780 (texas3006.com "Wall of Shame" post listing Antidote and commenting "I guess I have to go somewhere else for coffee."). That misunderstands Plaintiffs' claim. Plaintiffs allege that the prescribed signs serve as a "Scarlet Letter," attracting the ill will of members of the public. *See* ROA.41 ¶ 48. The negative review highlighted in the record is *evidence* that Plaintiffs' allegations of reputational harm are true, but it is not the *source* of Plaintiffs' reputational harm. Plaintiffs' harm flows from the challenged statutes and Defendants' enforcement thereof, which induce the Plaintiffs to post the prescribe signs. In any event, reputational harm is only one type of harm that Plaintiffs have suffered.

## B. Plaintiffs' injuries are redressable by a favorable judicial ruling.

Article III's third requirement—redressability—is also easily satisfied here. Traceability and redressability are "flip sides of the same coin." *Diamond Alt.*, 145 S. Ct. at 2133 (quoting *FDA v. All. for Hippocratic Medicine*, 602 U.S. 367, 380 (2024)). Just as common sense and the record establish that Defendants' enforcement of the challenged statutes as written contributes to Plaintiffs' injury—because a reasonable Texas gun owner knows that she can enter property with non-conforming signs without risking criminal sanctions—common sense and the record

39

establish that if the heightened notice requirements are enjoined, Plaintiffs will be able to exclude firearms with signage of their choosing without losing the protection of Texas's criminal trespass law.

Moreover, as noted above, it is more expensive for the Church to post section 30.06 signs, and for Antidote to post both section 30.06 and 30.07 signs, than it would be for either Plaintiff to post simple "no guns" signs. The record also reflects that the signs require regular replacement, and are not a one-time cost. ROA.1227. If the heightened notice requirements were invalidated, Plaintiffs could revert to the smaller, cheaper signs to convey their intended message and avail themselves of their right to exclude. And as the Supreme Court has recently reconfirmed, "[e]ven 'one dollar'" of cost savings "would satisfy the redressability component of Article III standing." *Diamond Alt.*, 145 S. Ct. at 2134 (quoting *Uzuegbunam v. Preczewski*, 592 U.S. 279, 292 (2021)).

Nevertheless, the district court held that Plaintiffs' claims were not redressable because the court "has no authority to strike parts of a criminal statute." ROA.2144-45.[5] This is a startling abdication of the judicial role. "It is emphatically

---

[5] The court also stated that "how various license holders would conduct themselves at the entrance doors of the church or coffee shop if the Court held the challenged statutory language unconstitutional is wholly speculative." ROA.2145. Concluding that license holders' behavior was speculative rather than predictable was error for reasons already discussed. *See supra* Section B.2.a.

the province and duty of the judicial department to say what the law is," *Marbury v. Madison*, 5 U.S. (1 Cranch.) 137, 177 (1803), and sometimes that means enjoining the enforcement of unconstitutional state laws. *See, e.g.*, *Dep't of Tex., Veterans of Foreign Wars v. Tex. Lottery Comm'n*, 760 F.3d 427, 431-34, 441 (5th Cir. 2014) (en banc).

Where, as here, "a statute benefits one class … and excludes another from the benefit …[,] '[a] court may either declare [the statute] a nullity and order that its benefits not extend to the class that the legislature intended to benefit, or it may extend the coverage of the statute to include those who are aggrieved by exclusion.'" *Sessions v. Morales-Santana*, 582 U.S. 47, 72 (2017) (final alteration in original) (quoting *Califano v. Westcott*, 443 U.S. 76, 89 (1979)). As the panel explained, if Plaintiffs obtain "a declaration that the heightened notice requirements imposed by sections 30.06(c)(3) and 30.07(c)(3) are unconstitutional and an injunction against their enforcement," then "Plaintiffs would be on equal footing with property owners who exclude other items via the less burdensome § 30.05 compliant signage." Op. 11. The panel's analysis is plainly correct, and indeed the dissent noted no disagreement. Plaintiffs' claims are redressable.

## III. Standing in This Case Should Not Be Complicated.

There is no mystery about Plaintiffs' answer to the key question, "What's it to you?" *Diamond Alt. Energy, LLC*, 145 S. Ct. at 2133 (citation omitted). The

bottom line is that Plaintiffs are subjected to a regulatory scheme that burdens their speech—by design. The Texas legislature has made the policy choice to deter property owners from exercising their right to exclude firearms by making it more onerous to express their intent to exclude. ROA.28 & n.1; ROA.1014 (statement of statute's author that the sign's language is intentionally cumbersome so as to discourage businesses from excluding firearms). The panel dissent's and the district court's position that Plaintiffs' "alleged injury is too speculative to support Article III standing" thus "misses the forest for the trees," *Tex. Corn Producers*, 141 F.4th at 697. At the end of the day, burdening Plaintiffs' property rights "is the *core purpose*" of the heightened notice requirements, *id.* Plaintiffs, subjected to that burden, have standing to challenge it.

Indeed, "[w]hen a plaintiff is the 'object' of a government regulation, there should ordinarily be little question that the regulation causes injury to the plaintiff and that invalidating the regulation would redress the plaintiff's injuries." *Diamond Alt. Energy, LLC*, 145 S. Ct. at 2135 (quoting *Lujan*, 504 U.S. at 561) (some quotation marks omitted). That rule applies here. Sections 30.06 and 30.07 expressly refer to "the owner of the property" in imposing their signage requirements. Tex. Penal Code §§ 30.06(b), 30.07(b). Plaintiffs are "owner[s] of … property" who have come to challenge those provisions.

And again, holding—as the panel did—that Plaintiffs have standing says nothing at all about the merits of their First Amendment challenge. Indeed, in the First Amendment context, the Supreme Court has long accepted that the application of a regulatory scheme to burden speech may constitute injury without prejudging the merits. In *Members of City Council of City of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789 (1984), for example, the Supreme Court considered a city ordinance that prohibited all signs on public property. Its application "to appellees' expressive activities surely raises the question whether the ordinance abridges their 'freedom of speech' within the meaning of the First Amendment, and appellees *certainly have standing to challenge* the application of the ordinance to their own expressive activities." *Id.* at 803 (emphasis added). "But to say the ordinance presents a First Amendment issue is not necessarily to say that it constitutes a First Amendment violation." *Id* at 803-04.

Plaintiffs, of course, intend to vigorously pursue their challenge to sections 30.06 and 30.07. No court has yet assessed what level of scrutiny applies or whether the government defendants can satisfy it. That is what should happen on remand.

## CONCLUSION

For the foregoing reasons, the judgment of the district court should be reversed, and the action should be remanded for further proceedings.

October 29, 2025

Respectfully submitted,

Alla Lefkowitz
Andrew Nellis
EVERYTOWN LAW
P.O. Box 1478
Washington, D.C. 20044
(646) 324-8365
alefkowitz@everytown.org
anellis@everytown.org

Laura Keeley
EVERYTOWN LAW
450 Lexington Ave.
P.O. Box 4148
New York, NY 10017
(646) 324-81998
lkeeley@everytown.org

*/s/ Charlotte H. Taylor*
Charlotte H. Taylor
 *Counsel of Record*
JONES DAY
51 Louisiana Ave., N.W.
Washington, D.C. 20001
(202) 879-3872
ctaylor@jonesday.com

William R. Taylor
JONES DAY
717 Texas, Suite 3300
Houston, TX 77002
(832) 239-3939
wrtaylor@jonesday.com

*Counsel for Plaintiffs-Appellants.*

## CERTIFICATE OF SERVICE

I certify that on October 29, 2025, I served a copy of the foregoing on all counsel of record by CM/ECF and email.

*/s/ Charlotte H. Taylor*
Charlotte H. Taylor
*Counsel for Plaintiffs-Appellants*

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume, typeface, and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)–(6) & (7)(B), and Fifth Circuit Rule 32.1 & 32.2. The brief contains 10,130 words and was prepared using Microsoft Word and produced in Times New Roman 14-point font.

Dated: October 29, 2025

*/s/ Charlotte H. Taylor*
Charlotte H.Taylor
*Counsel for Plaintiffs-Appellants*